

2016 NOV -7 AM 8:54

IN THE COURT OF APPEALS OF THE STATE OF WASHINGTON
DIVISION ONE

| | | |
|---|---|---|
| JAMES OSBORNE, an individual, | ) | No. 73355-9-I |
| | ) | |
| Appellant, | ) | |
| | ) | |
| v. | ) | UNPUBLISHED OPINION |
| | ) | |
| RECREATIONAL EQUIPMENT INC., a | ) | |
| Washington Corporation, | ) | |
| | ) | |
| Respondent. | ) | FILED: November 7, 2016 |

SCHINDLER, J. — James Osborne filed a lawsuit against Recreational Equipment Inc. (REI) alleging age and disability discrimination and that REI did not make reasonable accommodations in violation of the Washington Law Against Discrimination (WLAD), chapter 49.60 RCW, and wrongful discharge in violation of public policy. The court dismissed the age and disability discrimination claims and the wrongful discharge claim on summary judgment. Following a three-week trial on failure to accommodate in violation of the WLAD, the jury returned a verdict in favor of REI. Osborne seeks reversal of the jury verdict and remand for a new trial. Osborne challenges the jury instructions and the verdict form, denial of his motion for judgment as a matter of law, summary judgment dismissal of his disability discrimination and wrongful discharge

claims, and denial of a motion to compel discovery. We affirm the jury verdict, the orders on summary judgment, and the order denying the motion to compel.

FACTS

Employment at REI 1994-2007

James Osborne graduated from college with a degree in health care administration. Osborne has managerial experience but no formal training in information technology (IT). In May 1994, Recreational Equipment Inc. (REI) hired Osborne as a supervisor in the IT Department. Osborne later worked as the IT Systems Development Manager. In 1999, REI promoted him to IT Systems Development Director. In 2003, Osborne became the IT Business Services Director with 70 employees reporting to him.

Beginning in 1999, Osborne started cycling. Osborne was "consumed by" road cycling and "joined a group of cycling enthusiasts." Osborne would go on bike rides at lunch and traveled to Western Washington and the French Alps to go on long bike rides.

Bicycle Accident 2007

On Thursday, June 14, 2007, Osborne was riding with a group of cyclists at noon in a "racing formation."

> [S]o in this kind of simulated race condition at this point in time about two thirds into the ride there was a few of us had formed what was called a racing formation where we got several cyclists lined up in a row.

Near the end of the ride, Osborne heard a loud metallic noise, crashed, and landed on the road. Osborne suffered a spinal cord injury.

"[T]here was an outpouring of support and compassion" from his colleagues at REI. On June 21, one week after the accident, REI Senior Vice President/Chief

Financial Officer/Chief Administrative Officer Brad Johnson sent Osborne a letter promising to "extend job protection for your job through December 13, 2007" and in the meantime, pay him a full salary.

After intensive physical therapy, by August 2007, Osborne regained enough strength to walk using a cane. It was Osborne's intent to return to his position as the Director of IT Business Services. Osborne and his doctor discussed a plan that would allow him to transition to working full time by the end of February 2008.

In early November 2007, Osborne met with REI "to propose a return to work schedule." Osborne proposed returning to work part time on November 27 and by February 1, 2008 to February 29, 2008, working "up to a full-time schedule/5 days [a] week (except for [physical therapy] appointments)."

On November 7, 2007, Benefits and Human Resources Risk Manager Giselle Sampson asked Osborne's doctor to provide information to "help us understand [Osborne]'s ability to perform the essential job functions" for his position as director.

On November 14, Osborne sent an e-mail telling Johnson he could not attend the "IT forum" scheduled the next week. Osborne told Johnson "it is increasingly unlikely I will be able to return to work in December as I had very much hoped."

At the end of November, Dr. Barry Goldstein wrote a letter asking REI to postpone the plan to return to work as a director for another three months. Dr. Goldstein states Osborn had a physical setback "related to the complex interaction of spasticity and movement." But in his "professional opinion," Dr. Goldstein states Osborne "will be able to resume his job and perform it at the same level that he has

3

done in the past" with "minor and reasonable job accommodation." REI agreed to hold the director position open for another three months.

In February 2008, Osborne met with Johnson. Osborne said he "would like to be able to return to work in his current role . . . in a part time capacity with accommodations." Osborne asked Johnson to "hold the job open until July." Johnson told Osborne REI could not agree to keep the director position vacant that long. Johnson told Osborne that as soon as he obtained "clearance from the doctor to return to work on a part time basis," REI would identify "projects and assignments that will work with his transition back to the workplace."

> [Osborne] fully understands the implications of the business and that he will have the opportunity to work with the IT team in some capacity and do meaningful work and that it may not be in the director role.

On March 4, 2008, Dr. Goldstein sent a letter to REI authorizing Osborne to work two to six hours a week.

> I suggest that Mr. Osborne start at very few hours per week (perhaps 2-6 hours) and then increase as tolerated. Working closely with Mr. Osborne will be critical during this time. There is no set formula that allows us to predict the exact number of hours that will be tolerated each day or week. Mr. Osborne will have a much better sense of that after trying it out.

Osborne met with Johnson and Sampson later that month. Osborne said it was "clear" he was not going to be able to work full time and retain his "prior position as an IT director." REI worked with Osborne and his doctors to develop a plan to "help meet his needs." According to Osborne, he and Sampson discussed working in a new "one-off position" as an exempt part-time employee in the IT Department to give him the opportunity to work his way back to full time "without time pressures or date sensitive items."

4

## REI Creates Part-Time IT Consultant Position

In July 2008, REI offered Osborne the exempt part-time position of IT Consultant with an annual salary of $100,000. The "Work Accommodation Plan" allowed Osborne to work remotely from his house a maximum of eight hours a week on special projects with no set deadlines.

Osborne started work on July 28. His supervisor was Information Security Director Ed Telders. Telders asked Osborne to work on an intranet project. But Osborne decided he wanted to work on a vendor management project and report to IT Department Senior Vice President Bill Baumann. Osborne met with Baumann on a monthly basis. Baumann assured Osborne that he "was under no time pressure to return to work full time." According to Osborne, "[Baumann] said if it took a year, two years or more the company was going to stand behind me and support me."

On October 15, 2008, Dr. Goldstein increased the hours Osborne could work from 8 to 14 hours each week, 10 hours at home and 4 hours at REI. In March 2009, his doctor approved increasing his work schedule to 17 hours a week. On October 20, Dr. Goldstein approved increasing his hours from 17 to 24 hours a week.

In spring 2010, Osborne expressed interest in the open full-time Intake/Release Manager position to implement the new software application program (SAP). IT SAP Director Mark McKelvey agreed to give Osborne the opportunity to work as the SAP Intake/Release Manager "in an acting role" on a part-time basis. Osborne reported to SAP Process Analyst Manager Marianne Fisher. Osborne said the "thinking at that time was that perhaps I would be able to increase my hours at a pace that would meet their increasing demands for that position to actually work full-time at 40 hours a week."

Osborne said he did not "know at the time that I joined the team that I would be held accountable to strict deadlines."

In June 2010, Osborne filed a product liability lawsuit against REI and other manufacturers of the bicycle he was riding when he crashed on June 14, 2007. REI took steps to ensure Osborne's lawsuit was kept separate from his work as an REI employee.

In July, Dr. A.J. Bender informed REI that Osborne could "increase his hours at work to 28 hours per week as his energy allows." The revised Work Accommodation Plan dated August 16, 2010 states, in pertinent part:

> [Osborne] is currently working as an exempt employee on a reduced-hours basis in the job of IT Consultant and performing partial duties of an SAP Release Manager. This position is new, is directly related to REI's implementation of SAP, and is part of the new REI "Center of Expertise" for SAP. With concurrence from [Osborne]'s physician, REI and [Osborne] want to increase [Osborne]'s hours in this role from approximately 24 hours/week to approximately 28 hours/week.

In September, Fisher met with Osborne about missing a deadline. Fisher told Osborne "more rapid progress needs to be made" and she planned to assume some of his responsibilities. Osborne was upset. He told Fisher he "felt very strongly that . . . what she was communicating left the door open for termination," and it "seemed to [him] a sea change had occurred."

> I further explained that my initial focus coming back to work was to support my recovery. It seemed to me now that I was being treated like an independent contractor, assigned work until completed and if no new assignments then no employment. I said that I wanted the company to clarify its position on this as it seemed to me a sea change had occurred in how I was being treated. I told her I completely understand the 'at-will' nature of our employment, and am not looking for an employment contract. I am looking to have the company continue to treat me the same way it did when I first returned to work in July 2008. She said this was likely going to have to be addressed with [Human Resources].

6

Fisher and McKelvey decided to hire a full-time SAP Intake/Release Manager and assign other SAP tasks to Osborne. Fisher discussed the new work assignments, expectations, and deadlines with Osborne.

On September 17, Human Resources Senior Vice President Michelle Clements sent a memo to Osborne addressing his request that REI agree to employ him until age 65 and his request for work assignment flexibility. The memo states REI "does not enter into employment agreements with employees" and "REI can end your employment at any time." The memo states Fisher and Human Resources had worked with Osborne to design an accommodation plan that meets his medical restrictions and the business needs of REI. The memo states, in pertinent part:

> [T]his memo contains our response to the requests you made several months ago for special assistance from REI. I have listed your requests and our responses below.
>
> 1.    Job/financial security. . . .
>
> As you may already know, REI does not enter into employment agreements with employees, and we decline your request for an employment agreement. . . . [E]ither you or REI can end your employment at any time, with our without cause.
>
>    . . . .
>
> 5.    Work assignment flexibility. "I am asking for flexibility in the event I am not able to meet increasing weekly hour requirements of my new assignment at the pace needed (Intake/Release Manager as part of the IT Process/ Enterprise Solutions Team reporting to Marianne Fisher. Marianne repots to Mark McKelvey). I am officially titled IT Consultant but am performing this new role as I continue to increase work hours with doctor's permission. I am currently approved up to 24[hours]/[week]. I see my doctor in the next few months for an evaluation. Mark McKelvey has given verbal commitment to this flexibility."

> Kristin Bradley and Marianne Fisher have worked with you to design an accommodation plan that is based on your most recent medical certification . . . and the business needs of the co-op. . . . We will reevaluate the [accommodation] plan again on 11/23/10 and make modifications as necessary and appropriate.[1]

Clements met with Osborne to discuss the September 17 memo. Clements told Osborne REI does not "provide lifetime employment." Clements also told Osborne competitive market pressure required all REI employees to meet performance standards.

> What I shared with [Osborne] at that time is that there was a large change going on in the company, and that we were under very different competitive duress. Customers were using technology in very different ways to shop. That the pressure in the organization was much greater. That the expense pressure was much greater. And that, you know, there was the need to, you know, perform, contribute.

According to Osborne, Clements confirmed the IT work was more critical and demanding than it had been.

> There in fact had been a sea change in the work that is happening in IT. The work is more demanding, fast paced, centralized and enterprise-wide in its impact. She indicated I had been adding value and that my leadership was pleased with the work I had been doing.

In response to whether there was a "risk to his role," Clements told Osborne that "there may be a time and place where REI wouldn't have a role to offer him" and "if that were the case[,] he would be subject to any layoff benefits that we would provide any employee." Clements told Osborne that "if at any time he could not perform in his role," he was to "personally reach out" to her and his supervisors "to let us know if there were things that we needed to be doing within his job scope to help him be more successful." At the end of the meeting, Clements told Osborne her "door is open any time" he had "questions or concerns." Osborne "never reached out" to Clements.

---

[1] Italics omitted.

8

In December 2010, Osborne returned to work for Telders on the "Disaster Recovery Project." The December 13, 2010 memo from Baumann to Osborne states, in pertinent part, "Your assignments, as you and [Telders] have discussed, will be shifting from the partial duties of the SAP Release Manager in the [Center of Expertise] to now supporting the Disaster Recovery Program."

The April 25, 2011 revised Work Accommodation Plan states:

> Reason Accommodation Requested: [Osborne] is currently working as an exempt employee on a reduced-hours basis in the job of IT Consultant and performing duties supporting the Disaster Recovery program. With concurrence from [Osborne]'s physician, REI and [Osborne] want to increase [Osborne]'s hours in this role from approximately 24 hours/week to approximately 28 hours/week (as of August 16th, 2010).[2]

In spring 2011, Telders assigned Osborne to help Information Security Manager Carlos Melvin with the payment card industry (PCI) annual audit. The revised July 25, 2011 Work Accommodation Plan states:

> Reason Accommodation Requested: [Osborne] is currently working as an exempt employee on a reduced-hours basis in the job of IT Consultant and performing duties supporting the IT Disaster Recovery program and Payment Card Industry (PCI) Compliance audit. With concurrence from [Osborne]'s physician, REI and [Osborne] want to increase [Osborne]'s hours in this role from approximately 24 hours/week up to 28 hours/week as tolerated (as of August 16th, 2010).[3]

After the 2011 audit, REI decided to enter into a contract with a new auditor. In 2012, Osborne worked on the request for proposal and the PCI audit.

On August 2, 2012, Osborne resolved his lawsuit against REI in mediation.

---

[2] Boldface omitted.
[3] Boldface omitted.

On September 24, Osborne sent an e-mail to Melvin and Telders stating the "current cadence and volume" of the PCI audit work "is exceeding my part time work capacity" and requesting assistance.

Telders met with Osborne and told him it was important to adhere to the Work Accommodation Plan. To assist Osborne, Melvin contacted the other IT Department teams and "escalated issues with those teams" to make sure they were getting the necessary documentation done quickly.

Melvin and Telders had discussed for "many years" the need for a Compliance Program Manager. In October 2012, they agreed REI needed a full-time Compliance Program Manager. On October 17, Melvin sent IT Human Resources Business Partner Kristin Bradley an e-mail describing the need for the position.

> As REI continues to grow, it has become apparent that the need for a full time Compliance Program Manager role is needed. There are several regulation programs that REI must be compliant with. For example, the Payment Card Industry (PCI) was an annual project. There weren't any individuals who were tasked with the development and management of the program. This approach cost REI unplanned expenses and resources to remediate issues identified by auditors. This same type of problem exists for other compliance programs, such as compliance with state and federal laws, and compliance with internal data protection standards, etc. We need to ensure that all compliance needs are managed within a single role. This helps ensure REI is always complaint, remediation is planned, compliance guidance is provided to projects at inception, and compliance reporting is transparently provided to the appropriate ratifiers. In 2012, Jim Osborne (consultant) was aligned with the development and management of the PCI Program. Jim's limited hours and lack of technical background has limited his ability to independently manage this year's PCI audit. As the position matures into a broader compliance role, I feel Jim's limited hours and technical deficiencies will create barriers to maturing the role into a broader compliance program. A new Compliance Program Manager role should be crated and appropriately staffed.

REI agreed to create the new position. Melvin prepared a job description for the Compliance Program Manager (CPM). The job description states the CPM "Specializes

in the Development and Maintenance of Security Governance."[4] The responsibilities of the CPM include:

- Lead PCI Compliance Program
- Awareness Training
- Leads and manages compliance initiatives
- Provides technical direction for compliance solutions
- Data Protection
  - Maintain data protection classifications and standards
  - Liaison between Information Security and Data Owner
  - Maintains inventory of data locations (internal & external)
- Provides ongoing governance metrics and reporting
- Ensures Compliance with state and federal laws
- Ensures compliance with Security Policies, Standards, and Controls
- Information Systems Audit.

In October, Osborne purchased a house in Arizona. On November 30, Osborne sent Telders and Melvin an e-mail telling them the 2012 PCI audit was complete.

On December 12, Osborne confirmed there were "[n]o changes" to his Work Accommodation Plan that limited him to working no more than 28 hours a week.

<u>REI Eliminates Part-Time IT Consultant Position</u>

On December 13, IT Divisional Vice President Joseph Dell'Orfano and Bradley met with Osborne. Dell'Orfano told Osborne REI had decided to create a full-time position to manage IT risk and compliance, eliminate his part-time IT Consultant position, and lay him off. Dell'Orfano and Bradley told Osborne the new full-time CPM position would include responsibility for the PCI audit work. Bradley told Osborne he was eligible for rehire. Bradley said she examined the IT positions that were currently open but he was not qualified for any of the full-time positions. Bradley told Osborne he

---

[4] Emphasis omitted.

would remain on the payroll until January 2, 2013 so he would be eligible for the year-end bonus and could continue to receive retirement benefits.

After he was laid off, Osborne lived in Arizona and did not apply for any open positions at REI.

During the first quarter of 2013, REI eliminated approximately 100 positions. On March 24, The Seattle Times published an article reporting REI had "laid off a 'limited number' of employees at its Kent headquarters and in stores throughout the country." On March 27, Osborne sent an e-mail to The Seattle Times stating, "REI eliminated over 100 positions . . . over several months . . . due to cost cutting."[5]

Discrimination and Wrongful Termination Lawsuit

On May 31, 2013, Osborne filed a lawsuit against REI. Osborne alleged REI terminated him because of his age and disability; REI failed to engage in efforts to make a reasonable accommodations in violation of the Washington Law Against Discrimination (WLAD), chapter 49.60 RCW; and wrongful discharge in violation of public policy.

REI filed an answer and affirmative defenses. REI admitted that in July 2008, it created the exempt part-time IT Consultant position for Osborne. REI admitted that in December 2012, it eliminated the position and Osborne was laid off effective January 2, 2013. REI denied terminating Osborne because of his age and disability or violating public policy. REI denied failing to engage in an interactive process and accommodate Osborne.

---

[5] The message originated from an e-mail account using a false name but Osborne does not dispute he sent the e-mail.

REI asserted several affirmative defenses including "REI's actions were taken in good faith, full compliance with the law and were made in its best business judgment." REI alleged the claimed damages "must be reduced by the doctrine of after acquired evidence."

Summary Judgment

After engaging in discovery, REI filed a motion for summary judgment dismissal of the lawsuit. Osborne filed a cross motion for summary judgment on failure to accommodate and dismissal of the after acquired evidence defense.

The court granted the motion for summary judgment dismissal of the disparate impact age and disability discrimination claims and wrongful discharge in violation of public policy. The court denied REI's motion for summary judgment dismissal of the failure to accommodate claim. The court denied Osborne's motion for judgment on failure to accommodate and his motion to dismiss the after acquired evidence defense. Before trial, REI agreed to bifurcate the after acquired evidence defense.

Trial on Failure to Accommodate

A number of witnesses testified during the three-week jury trial on the failure to accommodate claim including Osborne, his health care providers, Telders, Melvin, Bradley, and Clements. The court admitted more than 300 exhibits into evidence. The parties stipulated Osborne was involved in a bicycle crash on June 14, 2007 and his injuries and impairment was the basis of the requirement for accommodation.

Osborne argued REI violated the WLAD by failing to engage in the mandatory interactive process and reasonable accommodation before terminating him in December 2012.

13

Osborne testified that in 2008, REI created the new exempt part-time IT Consultant position "to provide me the time necessary to get back to full-time, and get back to a director level position." Osborne testified he "felt humiliated walking around REI's campus as IT consultant."

Osborne testified it was his idea to work on the SAP project in 2010. He wanted to "try it on an acting basis, and perhaps build [him]self up into doing the full-time role." But as the SAP project approached implementation, Osborne said the demands of the job required REI to hire someone full time.

Osborne testified that in 2011 and 2012, he worked on the PCI audit. In July 2012, Osborne told his psychologist, Dr. Diane Adams, that he was dissatisfied with his job and thinking about whether "to leave and find a new environment or work in his existing environment."

Osborne sold his house on Mercer Island and in October 2012, he bought a house in Arizona. Osborne said he planned to talk to Telders about telecommuting from Arizona after Telders returned from medical leave in December 2012.

Osborne admitted he was not qualified for the CPM position. Osborne testified he knew that REI had a program that would pay for IT certifications but he "never did pursue any of those certifications." Osborne testified the new CPM position was full time and that in December 2012, he could work no more than 28 hours a week. Osborne admitted Bradley told him he was eligible for rehire and could apply for open positions at REI, and REI offered to provide "four months of out of placement training" and delayed the effective date of his termination until after the first of the year so he could be eligible for a bonus and get his retirement contribution. Osborne testified that

Bradley told him she had reviewed available positions and "none of them fit [his] qualifications." Osborne testified he "wanted to check" the available positions Bradley referred to and the day after he was laid off, he printed a list of all job openings at REI. Osborne testified that "every one of these jobs" was "listed as a full-time position." Osborne testified there were other projects he could have worked on that REI did not discuss or pursue such as vendor management, disaster recovery, security assessment, and business planning.

Osborne testified he applied for jobs in 2013 but did not apply to REI. Osborne said that after REI laid him off, "everything[ ] changed" and he "wasn't feeling any motivation" to increase his hours or "go reapply at REI." In response to the jury question, "Why haven't you applied for a position with REI?," Osborne testified:

> First reason is the impact of the — of this whole process left a very bad taste in my mouth, and I was extremely disappointed with the way that I was treated. And my references to the company, although I still love the product, and I think there are a lot of great things about the company, it really had a very difficult impact on me, and I just haven't felt a desire to want to go back to an environment that rejected me.

Telders testified that he worked for REI from 2008 until he was laid off in early 2013. Telders said he was Osborne's supervisor in 2011 and 2012 and he "created some projects" for Osborne to do: working on disaster recovery and later, helping Melvin with the PCI audit. Telders testified Osborne told him that he "didn't feel qualified to work on some of the disaster recovery, and asked to focus on the PCI audit."

Telders testified that in October 2012, it was clear there was a need for a full-time CPM position. Telders said Osborne was not qualified for the CPM position.

Telders testified that Baumann made the decision to eliminate the IT Consultant position because the "role was no longer needed." Telders testified he checked with his team and the other IT directors to see "whether there were any other roles that the IT consultant might perform" but there were no other projects and no open positions Osborne could fill. Work on disaster recovery was "put on hold" and was not funded in 2012. Telders said he did not participate in the layoff meeting with Osborne because he had just returned from medical leave.

REI Database Manager Jodi Shincke testified that after she was hired in August 2012, she spent time working on vendor management and talked to Osborne about the work he had done. But because of the layoffs in 2013, vendor management was "not going to be priority for REI at this point." Shincke said there "wouldn't have been an actual [vendor management] position . . . around this . . . time just due to our budget constraints."

Bradley testified that Baumann and Telders did not tell her "to terminate" Osborne. The decision was "considered . . . a layoff" because REI was "moving forward with eliminating [Osborne's] position" but he was eligible for rehire.

Bradley testified she verified the Work Accommodation Plan with Osborne the day before he was laid off because Osborne would be on "rehire status" and "[i]f he was going to apply for other jobs within REI," she "wanted to make sure that that accomodation [sic] plan was updated."

Bradley said that before the meeting with Osborne on December 13, she reviewed available job openings at REI but he was "not eligible to fulfill those roles because he can only work 28 hours a week." Bradley said REI "rarely give[s] advance

notice" of a layoff. Bradley testified that the responsibility to engage in "the interactive dialog" is "a two way street. It's a responsibility for [Human Resources], and the responsibility for the employee as well."

Clements testified that a layoff decision is "not performance related, it's not accomodation [sic] related . . . . It's eliminating that position." Clements testified the decision to lay off Osborne was not part of the larger layoff that took place in the first quarter of 2013. Clements said REI would not have allowed unpaid leave status for Osborne because his position was eliminated, and she "did not know what work, if any, we would have available come first quarter" of 2013.

Clements testified that "if an employee is disabled from the job, according to the doctor, they must be placed in another open position for which they are qualified." Clements said when Osborne was laid off, the only available positions were full-time positions.

At the conclusion of the evidence, Osborne filed a motion for entry of a directed verdict on the failure to accommodate claim against REI. Osborne also argued he was entitled to entry of a directed verdict on the defense of undue hardship. The court denied the motion for a directed verdict. The jury returned a verdict in favor of REI.

After the jury verdict, Osborne filed a CR 50 motion for judgment as a matter of law. Osborne argued the undisputed evidence established REI "per se failed to accommodate his disability" by eliminating his position "without engaging in an interactive process." Osborne argued the court erred in refusing to enter a directed verdict on undue hardship. The court denied the motion.

17

ANALYSIS

Osborne seeks reversal of the jury verdict and remand for a new trial. Osborne contends the jury instructions misstated the law, the verdict form was misleading, the court abused its discretion in refusing to give his proposed jury instructions, and the court erred in denying his motion for judgment as a matter of law. Osborne also argues the court erred in dismissing his disability discrimination and wrongful discharge claims on summary judgment and the court abused its discretion in denying his motion to compel.[6]

Jury Instructions and Verdict Form

Osborne argues the jury instructions misstate the law and the court erred in refusing to give his proposed instructions on the requirement to engage in an interactive process and the undue hardship defense.

Whether to give a jury instruction is within the discretion of the trial court and reviewed for abuse of discretion. Fergen v. Sestero, 182 Wn.2d 794, 802, 346 P.3d 708 (2015). The propriety of a jury instruction is governed by the facts of the particular case. Fergen, 182 Wn.2d at 803. Jury instructions are sufficient if the instructions are supported by the evidence, allow each party to argue its theory of the case, and when read as a whole, properly inform the trier of fact of the applicable law. Fergen, 182 Wn.2d at 803.

We review legal errors in jury instructions de novo. Fergen, 182 Wn.2d at 803. An erroneous instruction is reversible error only if it is prejudicial to a party. Fergen, 182 Wn.2d at 803. If the instruction contains a clear misstatement of law, prejudice is presumed and is grounds for reversal unless it can be shown that the error was

---

[6] Osborne is not appealing the court's dismissal of his age discrimination claim.

harmless. <u>Fergen</u>, 182 Wn.2d at 803. The party challenging an instruction bears the burden of establishing prejudice. <u>Fergen</u>, 182 Wn.2d at 803.

Under the WLAD, it is unlawful for an employer to discriminate against any person in the terms or conditions of employment or to discharge any employee because of a person's sensory, mental, or physical disability. RCW 49.60.180(3), (2); <u>Riehl v. Foodmaker, Inc.</u>, 152 Wn.2d 138, 144-45, 94 P.3d 930 (2004); <u>Pulcino v. Fed. Express Corp.</u>, 141 Wn.2d 629, 639, 9 P.3d 787 (2000). An employer who fails to reasonably accommodate a disabled employee constitutes discrimination "unless the employer can demonstrate that such accommodation would result in an undue hardship to the employer's business." <u>Pulcino</u>, 141 Wn.2d at 639.

To establish a prima facie case for failure to accommodate, the employee must show (1) he had a sensory, mental, or physical abnormality that substantially limited his ability to perform the job; (2) he was qualified to perform the essential functions of the job; (3) he gave the employer notice of the abnormality and its accompanying limitations; and (4) upon notice, the employer failed to affirmatively adopt measures that were available to the employer and medically necessary to accommodate the disability. <u>Riehl</u>, 152 Wn.2d at 145.

Once an employer becomes aware of the need for accommodation, the employer has an obligation to engage in an interactive process with the employee to identify and implement appropriate reasonable accommodations. RCW 49.60.040(7)(d); <u>Frisino v. Seattle Sch. Dist. No. 1</u>, 160 Wn. App. 765, 779, 249 P.3d 1044 (2011); <u>MacSuga v. Spokane County</u>, 97 Wn. App. 435, 443, 983 P.2d 1167 (1999). After the employee has

19

initiated the process, the employer has a duty to determine the nature and extent of the disability. Frisino, 160 Wn. App. at 780; Goodman, 127 Wn.2d at 409.

> A reasonable accommodation envisions an exchange between employer and employee, where each party seeks and shares information to achieve the best match between the employee's capabilities and available positions.

Frisino, 160 Wn. App. at 779; see RCW 49.60.040(7)(d); Goodman v. Boeing Co., 127 Wn.2d 401, 408-09, 899 P.2d 1265 (1995).

The interactive process requires a good faith exchange of information between the employer and the employee. Frisino, 160 Wn. App. at 780. The employee has a duty to cooperate with the employer's efforts by explaining the disability and the employee's qualifications. Frisino, 160 Wn. App. at 780; Goodman, 127 Wn.2d at 408.

The employer's obligation to engage in the interactive process extends beyond the first attempt at accommodation and continues when the employee asks for a different accommodation or where the employer is aware that the initial accommodation is failing and further accommodation is needed. Humphrey v. Mem'l Hosps. Ass'n, 239 F.3d 1128, 1138 (9th Cir. 2001).[7] The duty to accommodate " 'is a continuing duty that is not exhausted by one effort.' " Humphrey, 239 F.3d at 1138[8] (quoting McAlindin v. County of San Diego, 192 F.3d 1226, 1237 (9th Cir. 1999)).

The employer has an obligation to affirmatively take steps to help the disabled employee continue working at the existing position or attempt to find a position compatible with the limitations. Griffith v. Boise Cascade, Inc., 111 Wn. App. 436, 442,

---

[7] Because the WLAD is patterned after Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e-2, Washington courts may rely on federal law and decisions interpreting Title VII. See, e.g., Oliver v. Pac. Nw. Bell Tel. Co., 106 Wn.2d 675, 678, 724 P.2d 1003 (1986); Tafoya v. Human Rights Comm'n, 177 Wn. App. 216, 224, 311 P.3d 70 (2013).

[8] Internal quotation marks omitted.

45 P.3d 589 (2002). However, an employer is not required to create a new position, alter the fundamental nature of the job, reassign an employee to a position that is already occupied, or eliminate or reassign essential job functions. Pulcino, 141 Wn.2d at 644.

Washington courts, like federal courts, do not recognize a freestanding interactive process claim absent a possibility of accommodation as a basis of a disability discrimination claim. Fey v. State, 174 Wn. App. 435, 453, 300 P.3d 435 (2013). "A failure to engage in an interactive process does not form the basis of a disability discrimination claim in the absence of evidence that accommodation was possible." Fey, 174 Wn. App. at 453.

Here, the court used the Washington Pattern Jury Instructions to instruct the jury on the burden of proof for the failure to accommodate claim, the definition of "reasonable accommodation," and the definition of "essential function" of a job. 6A Washington Practice: Washington Pattern Jury Instructions: Civil 330.33, at 379 (6th ed. 2012) (WPI); WPI 330.34, at 383; WPI 330.37, at 388.

Jury instruction 5 describes the burden of proof to establish a claim for failure to accommodate as follows:

> Discrimination in employment on the basis of disability is prohibited. One form of unlawful discrimination is a failure to reasonably accommodate an employee's disability.
> To establish his claim of discrimination on the basis of failure to reasonably accommodate a disability, Mr. Osborne has the burden of proving each of the following propositions:
> (1) That he had an impairment that is medically recognizable or diagnosable or exists as a record or history - THE PARTIES AGREE THIS HAS BEEN PROVED; and
> (2) That either:
>     (a) Mr. Osborne gave REI notice of the impairment; or

21

(b) no notice was required to be given because REI knew about Mr. Osborne's impairment; and

(3) That either:

(a) the impairment had a substantially limiting effect on

(i) his ability to perform his job or be considered for a different job; or

(ii) his ability to access conditions of employment; or

(b) Mr. Osborne has provided medical documentation to REI establishing a reasonable likelihood that working without an accommodation would aggravate the impairment to the extent it would create a substantially limiting effect; and

(4) That he would have been able to perform the essential functions of the job in question with reasonable accommodation; and

(5) That REI failed to reasonably accommodate the impairment.

In determining whether an impairment has a substantially limiting effect, a limitation is not substantial if it has only a trivial effect.

If you find from your consideration of all of the evidence that each of these propositions has been proved, then your verdict should be for Mr. Osborne on this claim. On the other hand, if any of these propositions has not been proved, your verdict should be for REI on this claim.

Jury instruction 6 defines "reasonable accommodation:"

Once an employer is on notice of an impairment, the employer has a duty to inquire about the nature and extent of the impairment. The employee has a duty to cooperate with his employer to explain the nature and extent of the employee's impairment and resulting limitations as well as his qualifications.

An employer must provide a reasonable accommodation for an employee with a disability. The obligation to reasonably accommodate applies to all aspects of employment, and an employer cannot deny an employment opportunity to a qualified applicant or employee because of the need to provide reasonable accommodation.

A reasonable accommodation may include adjustments in the manner in which essential functions are carried out, work schedules, scope of work, and changes in the job setting or conditions of employment that enable the person to perform the essential functions of the job.

You may consider whether a party cooperated in the reasonable accommodation process in good faith by evaluating the merits of that party's claim that a reasonable accommodation did or did not exist.

22

Jury instruction 8 defines "essential function" of a job:

> An essential function is a job duty that is fundamental, basic, necessary and indispensable to filling a particular position, as opposed to a marginal duty divorced from the essence or substance of the job.
>
> In determining whether a function is essential to a position, you may consider, among others, the following factors:
> (1) whether the reasons the position exists include performing that function;
> (2) the employer's judgment as to which functions are essential;
> (3) the judgment of those who have experience working in and around the position in question;
> (4) any written job descriptions such as those used to advertise the position; and
> (5) the amount of time spent on the job performing the particular function.

The court also instructed the jury on the well-established law that an employer is not required to create a new position or eliminate or change the essential function of a job as an accommodation to a disabled employee. Pulcino, 141 Wn.2d at 644; Dean v. Municipality of Metro. Seattle, 104 Wn.2d 627, 633-34, 708 P.2d 393 (1985). Jury instruction 9 states:

> An employer is not required to change or eliminate the essential functions of a job as an accommodation to a disabled employee. Nor is an employer required to create a new position for a disabled employee.

Osborne contends jury instruction 7 misstates the law. The court crafted jury instruction 7. Jury instruction 7 addresses the duty of an employer to accommodate a disabled employee when the position is eliminated. Jury instruction 7 states:

> In the event that a position that exists for the purpose of providing a reasonable accommodation for an employee's disability is being eliminated, an employer must take affirmative steps and reasonably accommodate a disabled employee.
> Affirmative steps include:
> i.  Discussing the employee's existing limitations;
> ii.  Assisting the employee in an internal job search;
> iii.  Sharing with the employee job openings or possibilities of reassignment within the company;

23

To reasonably accommodate the disabled employee in this circumstance, the employer must help the disabled employee fill an open position, or be reassigned, within the company so long as an open position or the possibility of reassignment exists and the employee is qualified for the open position or reassignment.

If the position that is being eliminated is not a position whose purpose is to provide the disabled employee with a reasonable accommodation at the time of its elimination, the obligation to reasonably accommodate the employee does not apply.

An employer is not required to give a disabled person priority over those who are not disabled when filling an open position or making a reassignment.

Below, Osborne objected to the last sentence of the jury instruction that states, "An employer is not required to give a disabled person priority over those who are not disabled when filling an open position or making a reassignment." REI objected to the description of the affirmative steps an employer must take when the position it created as an accommodation is eliminated.

Even if error, Osborne cannot show prejudice. First, the undisputed testimony established Osborne did not apply for an open position and REI did not reassign him. And, as REI points out, the remainder of the jury instruction that describes REI's duty to accommodate favored Osborne.

Osborne also contends the court erred by not instructing the jury on "interactive dialogue." Jury instruction 7 states, in pertinent part:

In the event that a position that exists for the purpose of providing a reasonable accommodation for an employee's disability is being eliminated, an employer <u>must take affirmative steps</u> and reasonably accommodate a disabled employee.
Affirmative steps include:
  i.    <u>Discussing</u> the employee's existing limitations;
  ii.   <u>Assisting the employee in an internal job search</u>;
  iii.  <u>Sharing with the employee job openings or possibilities of reassignment within the company</u>;
To reasonably accommodate the disabled employee in this circumstance, <u>the employer must help the disabled employee fill an open</u>

24

<u>position, or be reassigned, within the company so long as an open position or the possibility of reassignment exists and the employee is qualified for the open position or reassignment.</u>[9]

Although jury instruction 7 does not use the phrase "interactive dialogue," as Osborne pointed out in closing argument, the instruction clearly addresses REI's obligation to engage in an interactive process.

> So if you look at instruction No. 6. This is the law. It tells you that the obligation to accommodate applies to all aspects of employment. And that's important. This duty to accommodate. And again the vehicles, the interactive process, if you look at the bottom where I have underlined there, it's such a critical step that the law tells you whether you participate in good faith is something you need to consider. It's something you need to consider in determining whether or not you rule in favor of Mr. Osborne, and that's important because the law wants both sides to engage. They want both sides to come together, like I said, to share information, to problem solve, and hopefully accommodate.
> If we look at number 7, which is just the next instruction. This builds on number six, and it talks about, again, what do you have to do in certain circumstances? And number seven tells you even when the position is being eliminated, the employer has obligations. The employer must take affirmative steps. They have a duty. They have the duty to do certain things that are enumerated here. To talk to the employee. To assist the employee. To share with the employee. Again, that's the vehicle. That's how this works. And if that doesn't happen, as I showed you on number six, that's something you have to consider when you are talking about the verdict form.

Because the record shows the instructions allowed Osborne to argue his theory of the case, he cannot show prejudice. We reject the argument that the court abused its discretion by refusing to give Osborne's proposed instructions. The proposed instructions were repetitious, argumentative, and erroneous.

Osborne also argues the verdict form was misleading. The verdict form asked the jury whether Osborne "proved by a preponderance of the evidence that REI failed to reasonably accommodate him." Osborne claims the verdict form should have focused

---

[9] Emphasis added.

on only "the time period between October and December 2012." Because Osborne did

not make this argument below, we need not consider it for the first time on appeal. RAP

2.5(a). In any event, Osborne cannot show prejudice.

In opening statement and again in closing argument, Osborne repeatedly

focused on the time period between October 2012 and December 2012. For example,

in opening statement, Osborne argued, in pertinent part:

> I have already told you that REI discussed all it did for [Osborne] back in
> 2008, but it is so important that you contrast that with what happened in
> 2012. . . . They didn't engage in any process.

In closing argument, Osborne argued, in pertinent part:

> Now, the last distraction you might see, and I expect you to see
> from [REI] is to talk about other years. . . . Every year but 2012. . . . This
> case is really about the fall of 2012. That is the critical time frame. That's
> what we are here to talk about, and I want to implore you focus on those
> details.

Undue Hardship Defense

Osborne asserts the court erred by refusing to instruct the jury on the undue

hardship defense and denying his motion for a directed verdict and judgment as a

matter of law on the defense of undue hardship.

We review the denial of a motion for judgment as a matter of law de novo. Davis

v. Microsoft Corp., 149 Wn.2d 521, 530-31, 70 P.3d 126 (2003). A motion for judgment

as a matter of law must be granted " 'when, viewing the evidence most favorable to the

nonmoving party, the court can say, as a matter of law, there is no substantial evidence

or reasonable inference to sustain a verdict for the nonmoving party.' " Davis, 149

Wn.2d at 531 (quoting Sing v. John L. Scott, Inc., 134 Wn.2d 24, 29, 948 P.2d 816

(1997)). "Judgment as a matter of law is appropriate only when no competent and

26

substantial evidence exists to support a verdict." Paetsch v. Spokane Dermatology Clinic, PS, 182 Wn.2d 842, 848, 348 P.3d 389 (2015). We "construe all facts and reasonable inferences in favor of the nonmoving party." Paetsch, 182 Wn.2d at 848; Yakima Fruit & Cold Storage Co. v. Cent. Heating & Plumbing Co., 81 Wn.2d 528, 530, 503 P.2d 108 (1972).

Under the WLAD, the employer must provide reasonable accommodation unless the employer can prove the accommodation would impose an undue hardship to the employer's business. WAC 162-22-075; Pulcino, 141 Wn.2d at 639.

REI did not assert an undue hardship defense and did not introduce evidence or argue at trial that an accommodation would have been an undue hardship.

Pretrial, Osborne argued the court should exclude any evidence of undue hardship because REI did not plead undue hardship as an affirmative defense. The court granted Osborne's motion to exclude evidence relating to an undue hardship defense.[10]

Osborne relies on Easley v. Sea-Land Service, Inc., 99 Wn. App. 459, 994 P.2d 271 (2000), and Erwin v. Roundup Corp., 110 Wn. App. 308, 40 P.3d 675 (2002), to argue the court erred in refusing to instruct the jury on undue hardship and grant his motion for judgment as a matter of law. Easley and Erwin are inapposite.

In Easley, the employer repeatedly refused to reassign the employee to lighter duty. Easley, 99 Wn. App. at 461-63. Unlike here, the employer argued the

---

[10] The court denied Osborne's motion to exclude evidence about layoffs and the reduction in the work force in 2013. The court ruled the evidence was relevant to the accommodation claim.

> Going back to . . . layoff or reduction in force. I think this is an issue that REI gets to present as part of its explaining to rebut your assertion that there are open positions that they could have moved your client to, and . . . I think this is something that the jury is going to have to sort out in terms of what the economic position of the company was at the time. What their — what was happening to their employment numbers, and to the extent that you were going to cross-examine their employees on it, that is all fair game.

accommodation created an undue hardship and "it would not be 'feasible' " to accommodate the employee. Easley, 99 Wn. App. at 468-69. In Erwin, the employer refused to modify lifting requirements of job. Erwin, 110 Wn. App. at 311-12. Unlike here, the employer terminated the employee because of "too many job restrictions." Erwin, 110 Wn. App. at 312. The employer testified the lifting requirement could not be modified. Erwin, 110 Wn. App. at 314-15.

Summary Judgment

Osborne appeals summary judgment dismissal of his disability discrimination and wrongful discharge in violation of public policy claims. We review summary judgment de novo, engaging in the same inquiry as the trial court. Neigh. All. of Spokane County v. Spokane County, 172 Wn.2d 702, 715, 261 P.3d 119 (2011). Summary judgment is appropriate when there is no genuine issue of material fact and the moving party is entitled to judgment as a matter of law. CR 56(c). We view all facts and reasonable inferences in the light most favorable to the nonmoving party. Young v. Key Pharm., Inc., 112 Wn.2d 216, 226, 770 P.2d 182 (1989).

A defendant moving for summary judgment has the initial burden to show the absence of genuine issues of material fact. Young, 112 Wn.2d at 225. If the defendant makes this initial showing, the burden shifts to the plaintiff to set forth specific evidence establishing a genuine issue of material fact. Young, 112 Wn.2d at 225 (citing Celotex Corp. v. Catrett, 477 U.S. 317, 325, 106 S. Ct. 2548, 91 L. Ed. 2d 265 (1986)). The plaintiff cannot meet its burden by relying on speculation or "mere allegations, denials, opinions, or conclusory statements" to establish a genuine issue of material fact. Int'l Ultimate, Inc. v. St. Paul Fire & Marine Ins. Co., 122 Wn. App. 736, 744, 87 P.3d 774

(2004) (citing CR 56(e); Grimwood v. Univ. of Puget Sound, Inc., 110 Wn.2d 355, 359, 753 P.2d 517 (1988)). If the plaintiff fails to make a showing sufficient to establish the existence of a material issue of fact, summary judgment is proper. Young, 112 Wn.2d at 225.

As a preliminary matter, we note that on appeal, Osborne repeatedly cites to trial testimony and trial exhibits to argue the court erred in dismissing the claims of disability discrimination and wrongful discharge on summary judgment. We consider only evidence that was before the court on summary judgment and disregard the citations to evidence presented at trial. RAP 9.12; Taliesen Corp. v. Razore Land Co., 135 Wn. App. 106, 129, 144 P.3d 1185 (2006).

The McDonnell Douglas burden-shifting analysis applies to the order and nature of proof on summary judgment for disability discrimination and wrongful discharge. Scrivener v. Clark College, 181 Wn.2d 439, 445, 334 P.3d 541 (2014) (citing McDonnell Douglas Corp. v. Green, 411 U.S. 792, 93 S. Ct. 1817, 36 L. Ed. 2d 668 (1973)); Wilmot v. Kaiser Aluminum & Chem. Corp., 118 Wn.2d 46, 70, 821 P.2d 18 (1991); Rose v. Anderson Hay & Grain Co., 184 Wn.2d 268, 275-76, 358 P.3d 1139 (2015); Rickman v. Premera Blue Cross, 184 Wn.2d 300, 314, 358 P.3d 1153 (2015).

Under McDonnell Douglas, the plaintiff has the burden of establishing a prima facie case of discrimination. Scrivener, 181 Wn.2d at 446; Wilmot, 118 Wn.2d at 70. If the plaintiff establishes a prima facie case, the burden of production shifts to the employer to articulate a legitimate nondiscriminatory reason for the adverse employment action. Scrivener, 181 Wn.2d at 446. The plaintiff must then produce evidence that "creates a genuine issue of material fact that the employer's articulated

reason was a pretext for a discriminatory purpose." Scrivener, 181 Wn.2d at 446. To meet the pretext prong, the plaintiff can show that the reason was pretextual or that although the employer's stated reason is legitimate, the discrimination was "a substantial factor motivating the employer." Scrivener, 181 Wn.2d at 446-47. If the plaintiff fails to meet the burden of production, the defendant is entitled to judgment as a matter of law. Hill v. BCTI Income Fund-I, 144 Wn.2d 172, 182, 23 P.3d 440 (2001).

Osborne presented no evidence that the decision to eliminate his exempt part-time IT Consultant position and lay him off in December 2012 was because of his disability. Even if Osborne could establish a prima facie case, he presented no evidence that the legitimate nondiscriminatory reasons for eliminating the exempt part-time IT Consultant position was pretextual.

In opposition to summary judgment, Osborne argued conflicting testimony about the reasons for eliminating his position and who made the decision showed pretext.

> REI has repeatedly changed its position concerning several aspects of Mr. Osborne's termination including: (1) the identity of the person who made the decision to terminate, [and] (2) the reasons for the termination.

The record on summary judgment does not support his argument. The undisputed deposition testimony of his direct supervisor Telders shows that in fall 2012, Telders and Melvin received approval from IT Department Senior Vice President Baumann to create the CPM position. Telders and Melvin knew the CPM position would include responsibility for the PCI audit work that Osborne had done in 2011 and 2012. Telders testified that as the chief information officer, Baumann had to agree to create the CPM position and eliminate Osborne's part-time IT Consultant position. The undisputed record establishes there was a consistent explanation for why REI created

the full-time CPM position and eliminated the part-time IT Consultant position. The deposition testimony of Clements that Baumann and Telders did not make the decision does not create a material issue of fact. There is no dispute that Clements was not directly involved in the decision to create the CPM position or eliminate the IT Consultant position.

Osborne also alleged REI "terminated [him] as retaliation for . . . exercising his right to bring a product liability suit." Terminating an employee for exercising a legal right supports a cause of action for wrongful discharge in violation of public policy. Gardner v. Loomis Armored, Inc., 128 Wn.2d 931, 935-36, 913 P.2d 377 (1996).

To establish a claim for retaliatory discharge, Osborne must show (1) he filed a lawsuit against REI, (2) he was terminated, and (3) there was a causal connection between the exercise of his legal right to file the lawsuit and termination. Wilmot, 118 Wn.2d at 68-69.

To establish a prima facie case, the employee "need not attempt to prove the employer's sole motivation was retaliation." Wilmot, 118 Wn.2d at 70. Instead, the employee must produce evidence that the actions in furtherance of public policy were "a cause of the firing, and may do so by circumstantial evidence." Wilmot, 118 Wn.2d at 70.[11] "[I]f the employer produces evidence of a legitimate basis for the discharge, the burden shifts back to the plaintiff." Wilmot, 118 Wn.2d at 70. "[T]he plaintiff must establish the employer's articulated reason is pretextual." Wilmot, 118 Wn.2d at 70. This test asks whether the employee's conduct in furthering a public policy was a "substantial" factor motivating the employer to discharge the employee. Wilmot, 118 Wn.2d at 71.

---

[11] Emphasis in original.

31

Because motive is often difficult to prove, a plaintiff can rely on circumstantial evidence. Wilmot, 118 Wn.2d at 69. A short proximity in time between the employee engaging in the protected activity and the employer terminating the employee when coupled with other evidence can support an assertion of retaliatory motive. Wilmot, 118 Wn.2d at 69; Francom v. Costco Wholesale Corp., 98 Wn. App. 845, 862, 991 P.2d 1182 (2000). In recognition of the difficulty to prove motive, our courts allow an employee to establish the causation element of the prima facie case by merely showing that he filed a lawsuit, that the employer had knowledge of the lawsuit, and that the employee was discharged. Wilmot, 118 Wn.2d at 69.

On summary judgment, REI conceded Osborne had a legal right to file a product liability lawsuit against REI. REI asserted "a legitimate nonpretextual nonretaliatory reason for the discharge" and argued there was no evidence that the nonretaliatory reason to eliminate the position and lay off Osborne was pretextual. Wilmot, 118 Wn.2d at 70. REI asserted the undisputed evidence showed there was no nexus between the product liability lawsuit filed in June 2010, the settlement in August 2012, and the decision to eliminate the IT Consultant position in December 2012. REI argued there was "no evidence that any decision-maker acted upon or even knew any of the details of Osborne's lawsuit."

In opposition to summary judgment, Osborne reiterated the same reasons he cited to argue pretext for age and disability discrimination. In specific, that inconsistent explanations for eliminating his position and who made the decision showed pretext. But as previously discussed, the record does not support his argument.

Osborne also argued the timing of his termination "serves to establish causation" because decision makers "were aware of Mr. Osborne's lawsuit as well as its settlement." But the undisputed and admissible evidence showed REI purposefully kept Osborne's product liability lawsuit separate from their employment of him. REI Claims and Litigation Manager Christine St. Peter testified, in pertinent part:

> 2.     I was involved with opposing and ultimately settling James Osborne's product liability lawsuit he filed against REI in June 2010.
> 3.     REI Legal handled Mr. Osborne's consumer lawsuit with the assistance of outside counsel. The legal team did not consult or involve Mr. Osborne's supervisors and followed protocol to keep Mr. Osborne's consumer claim separate from his work as an REI employee. While Mr. Osborne's direct and secondary supervisors may have had indirect knowledge that Mr. Osborne had sued REI, they were not informed of the details or progress of the lawsuit.

The evidence showed Melvin, Telders, and Baumann were not aware of his product liability lawsuit or settlement. And in his deposition, Osborne testified that he did not know whether Melvin, Telders, or Baumann were aware of his product liability lawsuit or settlement.[12]

---

[12] Osborne testified, in pertinent part:

> Q.   Do you know whether Bill Baumann was aware of your lawsuit, your products liability lawsuit?
> A.   I don't know.
> Q.   Do you know whether Ed Telders was aware of your products liability lawsuit?
> A.   I don't know.
> Q.   Do you know whether Carlos Melvin was aware of your products liability lawsuit?
> A.   I don't know.
> Q.   All right. Do you know whether Bill Baumann was aware of the settlement of your products liability lawsuit?
> A.   I don't know.
> Q.   Do you know whether Ed Telders was aware of the settlement of your products liability lawsuit?
> A.   I don't know.
> Q.   Do you know whether Carlos Melvin was aware of the settlement of your products liability lawsuit?
> A.   I don't know.

There is no admissible evidence that the decision of Telders and Melvin to create the CPM position and the decision of Baumann to eliminate the IT Consultant position was related to the lawsuit Osborne filed against REI in June 2010 or the resolution of the lawsuit in August 2012. The hearsay statement of an REI employee about a comment made during a meeting in 2014 does not establish Osborne's supervisors were aware of the lawsuit and settlement when he was laid off two years earlier or create a material issue of fact. REI employee Karen Halvorsen states, in pertinent part:

> 2.    On the morning of March 2, 2014, I attended a meeting with 20+ employees held by Catherine Walker, REI's Senior [Vice President] of Legal to celebrate REI's accomplishments for the year 2013.
> 3.    During Ms. Walker's speech to the group she addressed the significant financial challenges REI had to overcome in 2013, which included demeaning commentary that Mr. Osborne hit REI with yet another complaint.

Motion To Compel

Osborne contends the court erred in denying his motion to compel. REI argues that it promptly produced the late-disclosed documents, "most of which were duplicates of documents that had already been produced from other sources, and none of which proved material to the litigation." We review denial of a discovery request for an abuse of discretion. Beltran v. Dep't of Soc. & Health Servs., 98 Wn. App. 245, 255, 989 P.2d 604 (1999). A trial court abuses its discretion when its decision "is manifestly unreasonable, or exercised on untenable grounds, or for untenable reasons." Beltran, 98 Wn. App. at 256 (citing State ex rel. Carroll v. Junker, 79 Wn.2d 12, 26, 482 P.2d 775 (1971)).

After the discovery cut off, REI produced e-mails from the encrypted hard drive of Telders's computer. Osborne filed a motion to compel arguing the court should appoint

34

a special master. Osborne asserted the documents "had not been seen before" and "revealed the existence of other relevant materials not yet produced." REI argued it produced the e-mails "as soon as its vendor was able to restore them." REI argued the documents "had already been produced from other sources or had been made available to Osborne when he reviewed a complete set of all his REI emails on two separate occasions." The court did not abuse its discretion in denying the motion to compel.

We affirm the jury verdict, the order on summary judgment, and the order denying the motion to compel.

WE CONCUR:

Cox, J.